IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LESLEY A. HALL and JULIE E. WEST, Personal Representatives of JEREMIAH DALIN HALL (Deceased), | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 4:06CV3069 |
| THE COUNTY OF NEMAHA, NEBRASKA and THE CITY OF AUBURN, NEBRASKA, political subdivisions of the State of Nebraska; BRENT LOTTMAN, Sheriff of Nemaha County, Nebraska, in his official and individual capacities; CHRIS BAKER, CHRIS ERICKSON, and JOHN DOES 1-3, law enforcement officers employed by the County of Nemaha, Nebraska or the City of Auburn, Nebraska, in their individual and official capacities, BARBIE BAKER, GAIL KELSEY, TIERRA ERICKSON, and JOHN DOES 4-5, jailors and dispatchers employed by the County of Nemaha, Nebraska or the City of Auburn, Nebraska, in their individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **MEMORANDUM AND ORDER** |
| Defendants. | ) ) ) | |

It is undisputed that the plaintiffs' decedent, Jeremiah Hall (Hall), swallowed methamphetamine during a roadside stop of a vehicle in which he was riding. It is

also undisputed that several hours later he died in jail as a result of that oral ingestion of the drugs.

Making four claims, the plaintiffs have sued the defendants. (Filing 1.) The plaintiffs contend that: (1) pursuant to 42 U.S.C. § 1983, the defendants are liable for deliberate indifference to Hall's medical needs; (2) pursuant to 42 U.S.C. § 1983, the County of Nemaha and Brent Lottman, Sheriff of Nemaha County,[1] are liable for giving the jailors discretion to determine whether pretrial detainees required medical care, yet providing no special training to assist the jailors in that endeavor; (3) pursuant to 42 U.S.C. § 1983, the failure of the defendants to respond to the repeated complaints of Hall amounted to unconstitutional punishment of a pretrial detainee; and (4) under Nebraska law, the defendants are liable for wrongful death, negligence, false arrest, false imprisonment and intentional infliction of emotional distress.

The state law claims have been dismissed. (Filing 26.) Thus, the negligence, false arrest, false imprisonment and intentional infliction of emotional distress claims are no longer in play.

As for the other three claims, pending before me are motions for summary judgment (filings 46 and 49) submitted by the following defendants named in the complaint: the County of Nemaha, Nebraska; the City of Auburn, Nebraska; Brent Lottman; Chris Baker; Chris Erickson; Barbie Baker; Gail Kelsey; Tierra Erickson;[2] and John Does 1-5 employed by the County of Nemaha or the City of Auburn.

---

[1]To the extent this training claim is also made in the complaint against the City of Auburn, Nebraska, it fails because it is now undisputed that the City does not employ the jailors.

[2]As I shall point out later, some of the names of the individual defendants are misspelled in the complaint.

-2-

I will grant the motions for summary judgment regarding all of these defendants except for Kristopher Baker, a deputy sheriff for Nemaha County, and Barbara Baker, a jailor at the Nemaha County Jail.[3]  My reasons for this decision are set forth below.

## I.  FACTS

I divide my factual discussion into two sections.  The first part recites the undisputed material facts that require dismissal as to all defendants save for Kristopher Baker and Barbara Baker.  The second part recites the disputed material facts that preclude the entry of summary judgment as to those two defendants.

### A.   The Undisputed Material Facts That Require Granting the Motion

The defendants have generally complied with NECivR 56(a) regarding the method and manner of setting out undisputed material facts.  In a similar fashion, the plaintiffs were obligated to follow NECivR 56(b)(1).  That rule provides as follows:

> The party opposing a motion for summary judgment shall include in its brief a concise response to the moving party's statement of material facts.  The response shall address each numbered paragraph in the movant's statement and, *in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies.  <u>Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.</u>*

*Id.*  (Italics added, underlining in original.)

---

[3]Notwithstanding the similarity in last names, I have been unable to determine from the record whether Kristopher Baker and Barbara Baker are related.

The plaintiffs' brief is generally well-written and helpful.  However, the plaintiffs have frequently failed to follow NECivR 56(b)(1).  Instead of clearly controverting a specific allegation and giving me a specific citation to the record, the plaintiffs have sometimes made statements like: "Plaintiffs refer to the Deposition of Kris Baker for material concerning the material facts in Defendants' first (1) numbered paragraph."  (Filing 59 at CM/ECF pages 3-7 and ¶¶ 1-4, 6-8 (Response to Defendants' Statement of Facts–Nemaha County) and ¶¶ 1, 3–7 (Response to Defendants' Statement of Facts–City of Auburn).)  Because the plaintiffs have not complied with the rule by failing to state whether they agree or disagree with the defendants' facts and by neglecting to give me the page and line of the depositions they rely upon, the facts which have not been properly controverted by plaintiffs are deemed admitted.  *See*, *e.g.*, *Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1014-16 (D. Neb. 2005) (deeming failure of plaintiff's counsel to abide by local rules regarding opposition to summary judgment an admission of facts). [4]

In any event, and without regard to the foregoing, I find that the following are the material undisputed facts that warrant summary judgment:

1.     At approximately 3:30 a.m. on April 23, 2004, Kristopher Baker[5], a deputy sheriff for Nemaha County, Nebraska, was conducting a routine traffic stop in Nemaha County.  During the stop, Deputy Baker spotted another vehicle driving in an odd fashion.  Specifically, Deputy Baker observed the vehicle "turning its headlights on and off, pull onto the shoulder, turn off its headlights, then turn on its

---

[4]"'Judges are not like pigs, hunting for truffles buried in briefs.'" *United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir. 2001) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

[5]Despite the spelling of his first name ("Chris") in the complaint, Deputy Baker's first name is apparently "Kristopher."  Baker's counsel does not claim that the court lacks personal jurisdiction of Kristopher Baker.

-4-

headlights, and [drive] past [him] . . . ."  (K. Baker Aff., Filing 48-5, ¶ 2.)  Based on the vehicle's erratic driving, Deputy Baker discontinued his original traffic stop and pursued the new vehicle.  (*Id.*)  During his pursuit, the vehicle's headlights were turned off and the vehicle made an illegal U-turn.  (*Id.*)  Deputy Baker called for assistance from Jesse Blaser, an officer with the Auburn Police Department.[6]  (*Id.*)

2.     The officers stopped the vehicle and Deputy Baker made contact with the vehicle's driver, a female who had no identification on her at the time but was later identified as Melinda Nielsen.  (K. Baker Aff., Filing 48-6, ¶ 2.)  Deputy Baker then observed a male passenger, who was later identified as Jeremiah Hall, who "appeared to be nervous and fidgety."  (*Id.*)  While Officer Blaser talked with Hall, Deputy Baker asked Nielsen several questions and eventually conducted a field sobriety test on her.  (*Id.*)  Deputy Baker then placed Nielsen under arrest for driving under the influence and for drug possession.  (*Id.*)

3.     Although Deputy Baker interacted primarily with Nielsen during the stop, he overheard Hall's responses to Officer Blaser's questions and believed that Hall was "coherent, aware of what he was being asked or questioned about, and capable of responding to questions," all of which led Deputy Baker to believe that Hall "knew what was being asked of him."  (K. Baker Aff., Filing 48-6, ¶ 3.)

_____

[6]The plaintiffs have not specifically named Officer Blaser in the complaint. (Filing 1.)  Nor have they served him with a summons.  (*E.g.*, Filings 7-14 (summons returned executed).)  They have, however, named "John Does 1-3, law enforcement officers employed by the County of Nemaha, Nebraska or the City of Auburn, Nebraska, in their individual and official capacities."  For purposes of this decision, I do not decide whether the court has personal jurisdiction over Officer Blaser in his individual capacity.  Nor do I decide whether, if the court has, or subsequently acquires, personal jurisdiction over him, a motion for summary judgment would be granted or denied as to him.  Those issues may be raised by the parties in future pleadings.  If so, they will be resolved at that time. That said, the parties are encouraged to clarify Blaser's status.

However, it was also Deputy Baker's belief, based on his training and experience, that Hall's wide eyes, fidgety hand movements, nervous foot tapping, and sweating all indicated that he was under the influence of a narcotic.  (*Id.*)

4.    During his questioning of Hall, Officer Blaser also noted Hall's fidgety movements and concluded that Hall was under the influence of some substance. (Blaser Aff., Filing 48-7, ¶ 8.)  Officer Blaser specifically asked Hall about drug use and Hall then stated that he and Nielsen had been partying at a friend's house prior to the traffic stop, and admitted that someone at the party had given him over-the-counter cough syrup.  (*Id.*)  Officer Blaser also specifically asked Hall if there was anything in the stopped vehicle that he should be aware of, and Hall answered there was not. (Blaser Aff., Filing 48-7, ¶ 9.)  At least for a time, Blaser and Baker left Hall alone in the vehicle they had stopped, but Hall was removed from the vehicle after Baker observed Hall lighting incense, opening and closing the glove compartment and making "weird movements."[7]  (K. Baker Dep., Filing 57-9 at CM/ECF pages 16-19.)

5.    Having observed Hall "acting fidgety" and making movements around the center console of the vehicle's interior, the officers conducted a search incident to the arrest and one or both discovered a small plastic bag of a substance that they suspected was methamphetamine underneath the front seat against the center console. (K. Baker Aff., Filing 48-6, ¶ 2; Blaser Aff., Filing 48-7, ¶ 10.)  The officers then placed Hall under arrest, although Hall claimed that he knew nothing about the

----

[7]There is a suggestion in the plaintiffs' brief that the defendants have some unspecified liability for allowing Hall to remain in, or return to, the vehicle where he apparently swallowed the methamphetamine.  (*See* filing 59 at CM/ECF pages 6 and 10.)  I have ignored that suggestion.  First, the complaint contains no mention of any such claim.  Second, no federal constitutional violation is shown by simply allowing a passenger to remain in, or return to, a vehicle during the course of a traffic stop and related search for drugs.

suspected methamphetamine and insisted that it belonged to Nielsen.  (K. Baker Aff., Filing 48-6, ¶ 2.)

6.      Deputy Baker transported Nielsen to the Nemaha County Jail[8] for detention, and Officer Blaser transported Hall to the same facility.  (Erickson Aff., Filing 48-5, ¶ 3.)  Arriving at the jail, Hall was turned over to Tara Erickson[9] and Barbara ("Barbie") Baker, the two jailor/dispatchers on duty at the time.  Although Ms. Baker had prior experience working as a jailor/dispatcher in Johnson and Otoe counties, she was a recent addition to the Nemaha County jail staff.  (Erickson Aff., Filing 48-5, ¶ 2.) Therefore, Erickson was assigned to "basically observe [Ms. Baker] and to evaluate her preparedness to act individually as a jailor/dispatcher" since Ms. Baker was one day shy of being allowed to work independently.  (*Id.*)

7.      As Ms. Baker initiated the booking process with Hall, she noted that he was generally uncooperative and refused to answer some routine questions.  (B. Baker Aff., Filing 48-4, ¶ 2.)  However, despite his uncooperative nature, Ms. Baker felt that Hall was coherent.  (*Id.*)  Ms. Baker specifically asked Hall whether he had taken any "street" drugs (i.e., illegal drugs) or medicines; Hall stated that he had been taking medicine for a swollen tooth and high blood pressure, but did not specify exactly what type of medicine it was.  (*Id.*)  Hall specifically denied any use of street drugs and did not specify if or when he had last used them.  (*Id.*)  At the time, Hall did not ask for any medical attention, nor did he inform Ms. Baker that he needed to see a doctor.  (*Id.*)

---

[8]It is undisputed that the City of Auburn does not own the jail, run the jail, or employ the jailors.  (White Aff., Filing 48-8, ¶ 6.)  However, the Auburn police department does rent office space in the building.  (*Id.*)

[9]Tara Erickson is apparently misidentified in the complaint as "Tierra Erickson."  In any event, defense counsel does not claim that the court lacks personal jurisdiction of Tara Erickson.

8.     After conducting the routine inquiries associated with the booking procedure, Ms. Baker then attempted to photograph Hall, during which time Hall became angry and it appeared "that he might lose his temper." (B. Baker Aff., Filing 48-4, ¶ 3.)  Ms. Baker then asked Hall to sign the booking sheets and provide a fingerprint; Hall responded that he was not going to cooperate.  (*Id.*)  Eventually Ms. Baker gave Hall a set of "jail clothes" and led him to a changing room, but after several minutes it was clear to Ms. Baker that Hall was not going to cooperate.  (*Id.*; Erickson Aff., Filing 48-5, ¶ 3.)  Rather than force him into his jail clothes, Blaser and Ms. Baker decided to allow Hall to remain in his street clothes since he had already been searched at the time of his arrest and was again searched before he was taken to his cell.  (B. Baker Aff., Filing 48-4, ¶ 3; Blaser Aff., Filing 48-7, ¶ 13.)  In addition to refusing to put on a jail uniform, Hall demanded to speak to an attorney and Ms. Baker responded that he could call an attorney once he was in his jail cell with the phone and phone book located therein.  (B. Baker Aff., Filing 48-4, ¶ 3.)

9.     Barbara Baker, with Deputy Baker and Officer Blaser accompanying her, escorted Hall to the cell and Barbara Baker, among others, told Hall to go into the cell.  (B. Baker Aff., Filing 48-4, ¶ 3; Blaser Aff., Filing 48-7, ¶ 14; K. Baker Aff., Filing 48-6, ¶ 3.)  Hall refused to do so.  (K. Baker Aff., Filing 48-6, ¶ 3; Blaser Aff., Filing 48-7, ¶ 14.)  At that point, Deputy Baker and Officer Blaser both ordered Hall into his cell and Hall reluctantly complied, but Deputy Baker could sense that Hall was angry and that he "could erupt at any time and potentially could become violent." (K. Baker Aff., Filing 48-6, ¶ 3.)

10.     At approximately 5:30 a.m., after booking Nielsen and placing her in the female jail cells on the jail's north side, Ms. Baker returned to the cell area where Hall was located.  (B. Baker Aff., Filing 48-4, ¶ 3.)  At this time, Hall informed Ms. Baker that he did not feel very good and that he felt dizzy.  (*Id.*)  Ms. Baker specifically asked Hall if his stomach was bothering him and he stated that it did not hurt.  (*Id.*)

Ms. Baker repeatedly asked Hall what was bothering him but he would not respond. (*Id.*)

11.    Approximately one hour later, at 6:30 a.m., Ms. Baker returned to the cell area after she heard the sound of a toilet flushing. (B. Baker Aff., Filing 48-4, ¶ 4.) Another inmate informed Ms. Baker that she should go back to check on Hall, which she did. (*Id.*) Hall had his shirt halfway on and "appeared to be nervous or fidgety in his gestures." (*Id.*) Hall stated again that he did not feel good, but did not explain why he had flushed the toilet when asked. (*Id.*) Ms. Baker further stated that Hall did not request medical attention. (*Id.*)

12.    Ms. Baker's shift was scheduled to conclude at 7:00 a.m., and the next jailor/dispatcher on duty, Gail Kelsay,[10] arrived at 6:45 a.m. to be briefed on the inmates. (Kelsay Aff., Filing 48-3, ¶ 6.) After being briefed on Hall by Tara Erickson and Barbara Baker, Kelsay went to check on Hall at approximately 6:50 a.m. (*Id.* ¶¶ 6-7.) At that time, Hall appeared to be "agitated, jumpy, and he was talking to himself" while he faced the wall of his cell. (Kelsay Aff., Filing 48-3, ¶ 7.)

13.    Roughly five minutes later, at 7:00 a.m., Kelsay went to check on Hall a second time and once again Hall stood facing the wall, was talking to himself, and would not look directly at Kelsay. (Kelsay Aff., Filing 48-3, ¶ 7.) At approximately 7:10 a.m., Kelsay contacted Brent Lottman, Sheriff of Nemaha County, to ask whether Hall should be transported from the jail, possibly to detox, due to the fact that he was "quite agitated," still talking to himself, and refused to comply with Kelsay's request that he calm down and stop disturbing other inmates. (*Id.*; Kelsay Dep., Filing 57-6, 21:20-21.) Sheriff Lottman instructed Kelsay to call the rescue squad to transport Hall to the hospital if she thought it was an emergency. (Lottman

---

[10]Kelsay's last name is misspelled ("Kelsey") in the complaint. Defense counsel does not claim that the court lacks personal jurisdiction over Kelsay.

Aff., Filing 48-2, ¶ 3.)   After Kelsay stated that she did not feel that it was an emergency, Lottman told her that he would be coming to the jail himself within the hour and instructed her to continue to check on Hall in the meantime.  (*Id.*)

16.   Concerned by Hall's strange behavior, Kelsay went to check on Hall again at approximately 7:20 a.m. (Kelsay Aff., Filing 48-3, ¶ 8.)  Hall was sitting on his bunk but "his legs were moving, swinging back and forth, and he was moving his arms in a flapping motion against his chest." (*Id.*)  Hall did not specifically request medical assistance, but he was speaking in unintelligible "gibberish" and Kelsay could not understand what Hall was trying to say.  (*Id.*)

15.   About five minutes later, at 7:25 a.m., Kelsay went back to check on Hall yet again.  (Kelsay Aff., Filing 48-3, ¶ 9.)  This time Hall was quiet and Kelsay "thought he had gone to sleep" since Hall was laying "sideways on his bunk looking forward with his feet on the floor and his head down and til[t]ed to his side and had one arm across his chest." (*Id.*)

16.   Sometime between 7:25 and 7:30 a.m., after arriving back from gathering evidence at the motel room that Nielsen had rented, Officer Blaser checked on Hall in his cell.  (Blaser Aff., Filing 48-7, ¶ 16.)  At that time, Hall was walking about his cell, "breathing heavily and talking to himself." (*Id.*)  Officer Blaser was not concerned by this behavior because he regarded it as normal activity for someone under the influence of a substance like methamphetamine.  (*Id.*)

17.   At approximately 7:30 a.m., Daniel White, the Chief of Police for the City of Auburn, stopped by the jail facility and checked on Hall.[11] (White Aff., Filing

---

[11]Like Blaser, Chief White has not been specifically and individually named in the complaint or served with process.  *See* note 3.  For purposes of this decision, I do not decide whether the court has personal jurisdiction over Chief White in his individual capacity.  Nor do I decide whether, if the court has, or subsequently

48-8, ¶ 4.)  White stated that he did so at the request of Kelsay, who was concerned about Hall's agitation.  (*Id.*; Kelsay Dep., Filing 57-6, 41:19-22.)  White observed Hall "sitting upright on his bunk, looking ahead and talking to himself.  Hall was also kicking his right foot up in the air approximately two feet and waving his hands around in front of himself." (White Aff., Filing 48-8, ¶ 4.)  Although this behavior is peculiar when compared to normal individuals, White did not believe that Hall's actions were out of the ordinary for individuals under the influence of a substance like methamphetamine, and White "did not believe he needed medical attention at the time."  (White Aff., Filing 48-8, ¶-5.)

18.    Shortly thereafter, at approximately 7:45 a.m., Kelsay returned to check on Hall once more.  (Kelsay Aff., Filing 48-3, ¶ 9; Blaser Aff., Filing 48-7, ¶ 17.)  After she called out to Hall, one of the other inmates in the cell area suggested that Hall was dead.  (Kelsay Aff., Filing 48-3, ¶ 9.)  In response, Kelsay left the cell area to request that Officer Blaser and Deputy Baker check on Hall (*id.*), as it was the policy of Nemaha County not to allow female jailors/dispatchers to go into the actual cell itself, known as the "bull pen" or "day room" (*Id.*; Lottman Aff., Ex. 101, ¶ 2).

19.    Officer Blaser went back to the cell area to check on Hall in response to Kelsay's call.  (Blaser Aff., Filing 48-7, ¶ 17.)  Officer Blaser described Hall as "slouched down on his right side" with a "white" face and "marbled purple and white" skin elsewhere on his body.  (Blaser Aff., Filing 48-7, ¶ 17.)  Deputy Baker also checked in on Hall.  (K. Baker Aff., Filing 48-6, ¶ 4.)  Deputy Baker also noted that Hall was sitting on his bunk with his head against the wall, had no shirt on, and appeared "very pale."  (*Id.*)  Other inmates in the adjoining cells were awake and

---

acquires, personal jurisdiction over him, a motion for summary judgment would be granted or denied as to him.  Those issues may be raised by the parties in future pleadings.  If so, they will be resolved at that time.  As an aside,  it is probably not worth the plaintiffs' time to pursue White individually.  That, of course, is up to them. In any event, the parties are encouraged to clarify White's status.

-11-

began inquiring as to whether Hall was okay; one inmate stated that Hall had been trying to vomit. (*Id.*) Upon checking Hall, Deputy Baker discovered that Hall had a weak pulse and told Kelsay to call the rescue squad. (*Id.*) The rescue squad was called at approximately 7:48 a.m. (Blaser Aff., Filing 48-7, ¶ 17), and arrived shortly thereafter, at which time they checked Hall and determined that he was dead. (Blaser Aff., Filing 48-7, ¶¶ 17-18; K. Baker Aff., Filing 48-6, ¶ 4). The Complaint and Answer of the County of Nemaha and individual defendants, when read together, essentially stipulate that Hall died of an overdose of methamphetamine that he had swallowed. (Complaint (Filing 1) ¶¶ 17, 26; Answer (Filing 29) ¶¶ 13, 17). *After* Hall's death, it was discovered that he had earlier tried to swallow drugs in an effort to avoid apprehension when an Otoe County deputy sheriff, Brian Briley, made a traffic stop. (K. Baker Dep., Filing 57-9, at 14:24-15:11.) There is no evidence that any of the defendants were aware, at any time prior to Hall's death, that Hall had tried to swallow drugs during a previous traffic stop.[12]

20.     Brent Lottman, the Nemaha County Sheriff, has sworn that: (a) he is unaware of any prior overdose deaths in his jail; (b) if the jail personnel had become aware of a drug overdose or were informed of one, pursuant to the policies and procedures of the jail, the inmate should have been taken to the emergency room at the local hospital; (c) absent an indication from the inmate that he or she has overdosed, it is difficult to differentiate between a medical emergency and the behavior of a prisoner showing signs of non-life threatening intoxication; (d) the Nemaha County Jail has written policies and procedures regarding emergency medical treatment; and (e) he has completed the jail management course for sheriffs, he requires 18 hours per year of continuing educational training for all jail personnel and the jail is audited annually to make sure those continuing education requirements

---

[12]To the extent that the plaintiffs imply that one or more of the named defendants knew, or must have known, about Hall's earlier attempt to swallow drugs, there is no evidence to support such speculation.

-12-

are satisfied.  (Lottman Aff., Filing 48-2, ¶¶ 1, 2, 4 and attached Ex. A (written medical policy).)[13]

## B.    The Disputed Material Facts That Require Denial of the Motion

Regarding Kristopher Baker and Barbara Baker, the following facts are material and they are disputed:

21.    As Kristopher Baker, Barbara Baker and Officer Blaser were taking Hall to the cell after completing the initial booking procedures (*see* paragraph 9 above), Brian Warner, an inmate who was in the cell next to Hall and who knew Hall socially, heard the following:

> At around 5 a.m. noises woke me up.  From my cell, I could see two male officers and a female jailor bringing a man in camoflauge [sic] clothes back to the cell next to mine.  From my cell, I could not see Hall in his cell.  When he was brought in, I heard him panting and gasping. Right when he was first brought in I heard him ask to go to the hospital. I heard a male officer say that he wasn't getting out until he went to court.  I heard [Hall] tell the female jailor, while she was outside his cell, that he had swallowed his meth and needed to go to the hospital.  Then he was yelling it and pounding on the wall, and he yelled that he swallowed his dope.  I heard several male officers outside his cell say that they would call the medics when they got his paperwork ready. Hall yelled and pulled at the bars, and yelled that he couldn't see and he couldn't breath[e].  He was crying and screaming that he needed to go to the hospital.  I yelled to him to drink water and puke it back up.

(Warner Aff., Filing 57-4.)

---

[13]Neither the plaintiffs nor the defendants discuss in any detail the facts recited in this paragraph.  That said, my independent review of the record satisfies me that the facts recited in paragraph 20 are undisputed.

22.     Warner stated that Hall screamed and yelled for some time and then Warner described what happened next:

> After some time, around 7 a.m., he stopped screaming and he settled down and I hoped he went to sleep.  The female jailor came to look at him about 15 minutes later.  I looked into Hall's cell by using a Compact Disc as a mirror.  I saw him lying on his back on the floor with his hands on his chest, with his wrists in a circle so that his hands pointed down. I yelled that he wasn't moving, and others inmates yelled it too.  About half an hour later, I heard a female jailor come to his cell and called his name, but he didn't answer.  She left and a male officer came back and went into Hall's cell and yelled his name, but he was not responding. The officer came out and said to the jailor that he was D.O.A.  A few minutes later I could hear that the other jailors and police officers had come back to his cell, and I heard a male officer say that he shouldn't have been a guinea pig for his own stuff.

(Warner Aff., Filing 57-4.)

23.     Warner's version of the event is partially corroborated and expanded upon by two other inmates.

24.     Inmate Kenneth O. Rutherford has sworn to the following:

I was in Nemaha County jail on the 23rd of April 2004.  In the early morning of April 23rd I was awakened by someone coming into the cell. That someone was Jeremy Hall.  On or between 6:00 am and 6:30 am, Mr. Hall starting yelling for the jailor to come back because he was starting to have blurry vision and his heart was beating real fast and he needed to go to the hospital.  The dispatcher was Barbie Baker.  She came back at 6:30 am on the 23rd of April.  Barbie Baker then came back and asked Mr. Hall if he was ok.  Mr. Hall stated to dispatcher Barbie Baker that he needed to go to the hospital because his vision was going and he was having a problem breathing.  Barbie Baker stated to Mr. Hall that she would get a Deputy back to take him to the hospital.  At 7:55 am the morning of April 23, 2004 shift changed – the first shift

-14-

dispatcher Gail Kelsey came back and asked Mr. Hall if he was ok.  She asked this several times.  When she got no response, Gail Kelsey asked for Deputy Baker to come and check on Mr. Hall.  When Deputy Baker checked on him there was no pulse and Mr. Hall was not breathing.  At 8:00 am to 8:15 am Deputy Baker stated that he was glad that he didn't have to give CPR to Mr. [H]all.  Deputy Baker also stated that, "See this is what happens when you do your own dope"!!   Mr. Hall was pronounced dead at that time.

(Rutherford Aff., Filing 57-3.)

25.    Like Warner and Rutherford, inmate Travis Lotter told a somewhat similar story about the events surrounding Hall's death:

I was asleep that night, but Hall's yelling woke me up at around 4 to 5 a.m.  I could not see him from my cell at the end of the hall, but I was only about ten feet away.  I knew Hall because I am friends with his stepfather.  From his cell I could hear him yelling for medical attention many times, saying that he needed a doctor or he needed to go to the hospital, and I could hear him coughing and choking.  This went on for about 30 to 45 minutes.  At one point, I heard a male police officer say from down the hall, "You made your bed, now lay in it."  They also said maybe next time you will have somebody else do your dirty work.  Sometime around then I heard another inmate in a cell closer to Hall's say that they thought Hall had fallen off his bunk.  I believe the jailors could easily hear Hall yelling, as the jail is small and the sound echoed.

(Lotter Aff., Ex. 108.)

## II.  ANALYSIS

Condensed and summarized, the named defendants argue that summary judgment must be granted either because they have no liability on the merits or because they have qualified immunity.  I turn to those questions next.

-15-

## A.  The "Deliberate Indifference" Claims

Of the three remaining claims, two are closely related.  In the first claim, the plaintiffs assert that the defendants deliberately failed to care for Hall's medical needs while he was in jail.  The other related claim is that the defendants improperly punished Hall by deliberately failing to give him proper medical care when he was a person who had not been convicted of a crime.  As a result, it is alleged that they violated Hall's due process rights under the Fourteenth Amendment.  As I will explain, the same standard applies to both of these claims.

A person is a "pretrial detainee" when held in the government's custody before that person is convicted of a crime.  When discussing the rights of pretrial detainees, the parties turn to cases decided under the Eighth Amendment's cruel and unusual punishment clause.[14]

When it comes to the Eighth Amendment's prohibition against cruel and unusual punishment, pretrial detainees have the same rights as convicted prisoners.  *See*, *e.g.*, *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007) (applying the Eighth Amendment standard and holding that a delay of about 45 days in the treatment of a pretrial detainee's significant and painful dental problems did not violate the Eighth Amendment despite the fact that the pretrial detainee twice requested treatment and was seen only after he threatened to file suit) (citing and quoting *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006), *cert. denied*, --- U.S. ----, 127 S. Ct. 2128 (2007).)

---

[14]For some, application of the Eighth Amendment is technically thought to be limited to situations where a person has been convicted of a crime and the state then imposes "punishment."  For them, to speak of the Eighth Amendment in the context of a pretrial detainee's claim is a bit of a misnomer.  However, if it is a misnomer, it is a convenient shorthand given that Eighth Amendment *standards* apply to pretrial detainees.

To prove an Eighth Amendment violation regarding denial of medical care, "'an inmate must prove that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs.' *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). Deliberate indifference is equivalent to the criminal law standard of recklessness–'a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hartsfield*, 491 F.*3d* at 396-97 (quoting *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004), in turn quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).). The Court of Appeals has reminded us that "[e]ach step of this inquiry is fact-intensive." *Id.* at 397.

As for the plaintiffs' claim that the defendants improperly punished Hall as a pretrial detainee by failing to provide him with medical care, I must apply the same "deliberate indifference" standard applicable to the other claim. That is, "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety." *Butler*, 465 F.3d at 345 (county sheriff did not act with deliberate indifference to serious health risk that tuberculosis posed to detainees in county jail).

In summary, in order to get to a jury on these two claims, the plaintiffs must present facts that, if believed by a reasonable jury, prove two things. The plaintiffs must demonstrate that Hall had objectively serious medical needs, and that one or more of the defendants actually knew of, but deliberately disregarded, those needs. Anything less, and these claims fail.

**1.    *Deliberate indifference claims as to Kristopher Baker and Barbara Baker***

Whether viewed from the perspective of the merits or from the perspective of qualified immunity, the disputed material facts recited above as they pertain to Kristopher Baker and Barbara Baker require a trial on the plaintiffs' claims that these defendants were deliberately indifferent to Hall's medical needs. Remembering that this inquiry is "fact-intensive," *Hartsfield*, 491 F.3d at 397, I next describe why I will deny the motion regarding these two defendants.

It is undisputed that Hall died of an overdose of methamphetamine and it is undisputed that the overdose occurred as a result of Hall swallowing the drugs while at the scene of a vehicle stop. It is also obvious that Hall had a serious medical need for the treatment of that overdose. Furthermore, it is undisputed that both Kristopher Baker and Barbara Baker (and Officer Blaser) knew that Hall had been arrested for possession of drugs. If Hall's fellow inmates are believed, a reasonable jury could also conclude that Kristopher Baker and Barbara Baker (and Officer Blaser) knew that Hall had "swallowed his meth" because Hall made that statement to them as he was being escorted to his cell, and, at or about that same time, they also knew that Hall was "panting and gasping" claiming that "he couldn't see and he couldn't breath[e]" and that he was "crying and screaming that he needed to go to the hospital." (Warner Aff., Filing 57-4. *See also* Lotter Aff., Filing 57-2; Rutherford Aff., Filing 57-3.) Still further, some type of confrontation occurred between Hall, Kristopher Baker, Barbara Baker (and Officer Blaser) as the officers and the jailor tried to put Hall into the cell. Thus, a reasonable jury might conclude that the defendants were upset with Hall. In addition, it is undisputed that Hall was left in the cell between the time he was first put there at about 5:30 A.M. until he was discovered to have died at about 7:48 A.M. During that time he received no medical care from Kristopher Baker or Barbara Baker even though there is evidence that he continued to complain. Finally, Sheriff Lottman has sworn that if "we . . . were informed of" a "drug overdose condition," Hall should have been "taken . . . to the

emergency room of the local hospital in Auburn, Nebraska." (Lottman Aff., Filing 48-2, ¶ 4.)

I conclude that the facts that I have just recited, if believed, would permit a reasonable jury to conclude that Hall had objectively serious medical needs, and that Kristopher Baker and Barbara Baker actually knew of, but deliberately disregarded, those needs. As a result, these defendants are not entitled to summary judgment due to qualified immunity or on the merits. *See*, *e.g.*, *Gordon ex rel. Gordon v. Frank,* 454 F.3d 858, 863 (8th Cir. 2006) (affirming denial of motion for summary judgment based on qualified immunity in case alleging deliberate indifference; inmate died and officer knew inmate had medical issues that placed him on high observation status, officer was present when inmate asked for help climbing stairs to his cell and saw him struggling up stairs, officer received intercom call from inmate requesting blood pressure test and overheard call in which inmate told another officer he could not breathe and was in pain, and inmate told him he had trouble breathing during officer's subsequent check on cells; stating that: "A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress, *especially one who communicates this distress directly to officers*." (emphasis added)); *Plemmons v. Roberts*, 439 F.3d 818, 823-24 (8th Cir. 2006) (on pretrial detainee's § 1983 Eighth Amendment deliberate indifference claim, where the facts were disputed about whether the plaintiff told the jailors about his heart condition and whether the plaintiff told a jailor he was then having a heart attack, corrections officers' alleged delay in providing medical care to a jail inmate who in fact suffered a damaging heart attack while in jail constituted conduct that, if true, would have violated clearly established law, and thus, officers were not entitled to summary judgment due to qualified immunity).

## 2.    *Deliberate indifference claims as to the other named individual defendants*

The other named individual defendants are entitled to summary judgment both as to the merits and as a result of the doctrine of qualified immunity. It is very important to remember that the "cases make clear that an officer has immunity for *reasonable* mistakes." *Gordon ex rel. Gordon,* 454 F.3d at 864 (citing *Parks v. Pomeroy*, 387 F.3d 949, 957 (8th Cir. 2004) and *Davis v. Hall*, 375 F.3d 703, 720 (8th Cir. 2004) (emphasis in original)).

Generally, and unlike the evidence regarding Kristopher Baker and Barbara Baker, there is no evidence that Hall told any of the other defendants that he had overdosed on his own methamphetamine. There is also no evidence that Kristopher Baker or Barbara Baker (or Officer Blaser) told the other named defendants what Hall allegedly told them. While Hall was complaining, uncooperative and acted like an intoxicated person both before he was put in his cell and while he was in the cell, and while it was evident that Hall had used street drugs, none of these facts would have caused a reasonable person (or a reasonable officer or jailor) to believe that Hall had an objectively serious medical need that posed a serious risk of injury if not addressed. From the perspective of the other named individual defendants, Hall was behaving like many other besotted pretrial detainees who are plucked from the highway in the wee hours of the night and who suffer nothing more than drug-induced stupor while cooling their heels in a cell awaiting their turn to see the local magistrate.

Specifically, if one looks carefully, as I have, at the conduct of each of the other named individual defendants, it is clear that the plaintiffs should not be allowed to proceed against them. Next, I briefly summarize why I reach this decision.

\*    So far as I can tell, Sheriff Lottman had no personal contact with Hall. When telephoned by Kelsay about whether Hall should be taken to the hospital,

-20-

Lottman instructed Kelsay to call the rescue squad if she believed there was an emergency. When Lottman was told by Kelsay that she did not believe there was an emergency, the sheriff instructed Kelsay to continue to monitor Hall and she did. There is a complete absence of evidence suggesting that the sheriff was deliberately indifferent.[15]

     \*     There is no evidence of any kind against Chris Erickson.

     \*     Gail Kelsay's involvement with Hall, although substantial, shows concern rather than deliberate indifference. Remembering that she reported to duty at about 6:45 A.M., after Hall had been booked and put in a cell, Kelsay checked on Hall five times in the space of about an hour. Moreover, Kelsay phoned Sheriff Lottman to solicit his advice about the proper course of action to take regarding Hall. Later, she asked Chief White to check on Hall and he did. White did not believe that Hall's actions were out of the ordinary for individuals under the influence of a substance like methamphetamine. While Kelsay may have erred in assessing Hall's condition, there is no evidence that she did so because she was deliberately indifferent to his well-being.

---

[15]The plaintiffs may also claim that Lottman has personal responsibility for the actions of his subordinates because he tolerated or encouraged his employees to be deliberately indifferent to the serious medical needs of Hall or pretrial detainees like Hall. If they make that claim, it fails. To prevail on such a claim "'[t]he plaintiff[s] must demonstrate that [Lottman] was deliberately indifferent to or tacitly authorized the offending acts.'" *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)) (affirming summary judgment for supervisors where dead inmate might have been saved if subordinates had administered CPR). There is no evidence that Lottman directly or tacitly authorized his subordinates to withhold medical treatment from Hall or from pretrial detainees like Hall.

-21-

\*      Tara Erickson had little involvement with, or responsibility for, Hall. Erickson served a training officer for Barbara Baker, as Baker completed her last evening of training.  Knowing that Baker had prior experience as a jailor/dispatcher for two other counties, Erickson had no reason to doubt Baker's competency.  Still further, there is no evidence that Erickson knew that Hall had allegedly told Barbara Baker, Officer Blaser and  Deputy Baker that he had swallowed methamphetamine. Again, there is no evidence that Erickson was deliberately indifferent to Hall.

\*      As for the defendants who are named as "John Does," there is no evidence that an unknown officer or an unknown jailor played any part in Hall's death.[16]

In summary, and without much more, the failure to call for medical help in response to the rants and raves of an intoxicated  reveler who subsequently succumbs does not turn the otherwise tragic death into "deliberate indifference" on the part of cops or jailors.  *See, e.g., Ruark v. Drury*, 21 F.3d 213, 214-217 (8th Cir. 1994) (affirming summary judgment in favor of jail officials even though the parents of the county jail inmate, who apparently died from a drug overdose on the way to hospital, showed that the inmate returned to jail from work release with a "red and flushed" face, was moving slower than normal and appeared to have a cold, even though the plaintiffs showed that jailors twice checked on the inmate in the morning and found that he had brown fluid (thought to be from chewing tobacco) dripping from his mouth, was not responsive, mumbled and had labored breathing and even though the plaintiffs showed that the jailors waited until a third check of the inmate to call for an ambulance).

---

[16]*But see* footnotes 6 and 11 regarding the possibility that Officer Blaser and Chief White may be two of the "John Does."

3.    *Deliberate indifference claims as to the County of Nemaha and the City of Auburn*

To the extent that the plaintiffs claim that the institutional defendants have liability because of a custom, practice or policy of consciously or recklessly tolerating or encouraging their employees to be deliberately indifferent to the serious medical needs of pretrial detainees, there is no evidence to support that claim. Indeed, the written policy of the County of Nemaha regarding the medical treatment of jail inmates completely disproves any such suggestion. (Lottman Aff., Filing 48-2, ¶ 4 and attached Ex. A (written medical policy).) For example, that policy instructs jailors to implement a written emergency health care plan when an inmate shows signs of unconsciousness or serious breathing difficulties and that policy lays out specific steps to take in the event of such an emergency. (*Id.* at Ex. A ¶ B at CM/ECF pages 4-5 and Appendix F, Emergency Medical Care Plan at CM/ECF pages 9-17.)

Furthermore, before Hall's death, there is no evidence that any inmate had ever died of a drug overdose while in the custody of the defendants. Still further, both Sheriff Lottman and Chief White behaved in a way that evidenced concern for Hall's well-being. Lottman instructed Kelsay to call the rescue squad if she thought Hall's condition was emergent. White, at the request of Kelsay, personally went to the cell block to check on Hall.

In sum, the institutional defendants cannot be held liable for deliberate indifference on the theory that they consciously or recklessly tolerated or encouraged such behavior on the part of their employees. The evidence is woefully lacking.

### B.  The Training Claim

The plaintiffs also claim that Sheriff Lottman and the County of Nemaha violated Hall's constitutional rights because jailors were given discretion to decide

-23-

what constituted a medical emergency without the necessary training to make those decisions.  For two reasons, this claim fails.

Initially, and by way of background, defendants, such as sheriffs and county governments, may have liability if they fail to train their employees and, as a result of that lack of training, the constitutional rights of another person are violated.  *See*, *e.g.*, *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390-95 (8th Cir. 2007) (en banc) (in the context of a policy regarding the use of police dogs, discussing the various ways local governments might be held liable for the actions of employees taken pursuant to policies adopted by supervisors and governmental actors); *Tlamka*, 244 F.3d at 635 (dealing with failure-to-train claim regarding when to administer medical treatment such as CPR).

First, the plaintiffs' training claim fails because there is no evidence showing that training would have made a difference.  That is, there is no reason to believe that had the jailors been trained differently or more thoroughly,[17] the outcome would have changed.  Indeed, the evidence is that Chief White checked on Hall 18 minutes before Hall was found dead and he concluded that there was no emergency.  If a well-trained and experienced chief of police[18] lacked the ability to discern Hall's emergent condition, it is very unlikely that a jailor, even one trained to the unknown specifications of the plaintiffs, would have done any better.  Thus, the plaintiffs' training claim fails for lack of evidence of causation.  *See*, *e.g.*, *Szabla,* 486 F.3d at

---

[17]The plaintiffs presented no evidence showing what specific training should have been provided.

[18]White had been a police officer for about 9 years at the time of this incident, and he received his law enforcement training and certification from the Nebraska Law Enforcement Training Center in December of 1995.  (White Aff., Ex. 107, ¶¶ 2-3.)

-24-

394-95 (change in policy about how police handled dogs would not have altered the outcome and thus plaintiffs failed to prove the indispensable element of causation).

Second, even if one assumes that the training was insufficient and further training was needed, there is no evidence that Lottman or the County of Nemaha were aware of, or should have been aware of, the deficiency. In fact, the evidence is all to the contrary. For example, Lottman has sworn that he was trained regarding the administration of jails, training is given to jailors, auditors make sure jailors get the required training, there is a written policy on emergencies, this was the first death to occur as a result of a drug overdose, and it is difficult to distinguish the behaviors of inmates who are simply intoxicated from inmates who are intoxicated and who also have serious medical problems. Absent evidence that Lottman or the County were aware of, or should have been aware of, the alleged deficiency in training, there can be no liability on their part even if there was a problem with the training. *See*, *e.g.*, *Tlamka*, 244 F.3d at 635 (holding that because "the record is void of any facts which would have alerted [the supervisory defendants] that the officers were inadequately trained[,]" the supervisory defendants had no liability for the death of an inmate who allegedly died because subordinates failed to provide medical care).

## III. CONCLUSION

Because of disputed facts, two defendants must undergo the rigors of trial to determine whether they violated Hall's constitutional rights. As for the others, there are no disputed facts and summary judgment must be granted in their favor.

The motions for summary judgment also raise issues about the type of damages that may be recovered, but given the prior ruling dismissing the state law claims and the portion of this decision pitching the institutional defendants, most of those issues have now been mooted. As for the punitive damages claims against persons in their individual capacities, suffice it to say that only damages recoverable under section

1983 will be allowed and I cannot determine that question until I hear the trial evidence.

IT IS ORDERED that the motions for summary judgment (filings 46 and 49) are granted in part and denied in part as follows:

1.      The motions for summary judgment are denied as to Kristopher Baker, named in the complaint as "Chris Baker" and as to Barbara Baker, named in the complaint as "Barbie Baker."

2.      The motions for summary judgment are granted as to the County of Nemaha, Nebraska; the City of Auburn, Nebraska; Brent Lottman, Sheriff of Nemaha County, in his official and individual capacities; Chris Erickson, in his individual and official capacities; John Does 1-3, law enforcement officers employed by the County of Nemaha, Nebraska or the City of Auburn, Nebraska in their individual and official capacities; Gail Kelsay, named in the complaint as Gail Kelsey, in her individual and official capacities; Tara Erickson, named in the complaint as Tierra Erickson, in her individual and official capacities; and John Does 4-5, jailors and dispatchers employed by the County of Nemaha, Nebraska or the City of Auburn, Nebraska, in their individual and official capacities.

3.      The court does not decide whether it has personal jurisdiction over Officer Jesse Blaser or Chief Daniel White in their individual capacities.  In addition, the court does not decide whether, if it has, or subsequently acquires, personal jurisdiction over Officer Blaser or Chief White in their individual capacities,

-26-

motions for summary judgment would be granted or denied if asserted by them.

September 7, 2007.                    BY THE COURT:

                                     *s/ Richard G. Kopf*
                                     United States District Judge